1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOSHUA PHILLIPS,

11              Petitioner,              No. CIV S-04-1257 GEB GGH P

12        vs.

13   SCOTT KERNAN, et al.,

14              Respondent.           FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction for

19   fifteen counts of lewd or lascivious acts upon minors under the age of 14 (counts 1-15) (Cal.

20   Penal Code § 288(a)), and one count of sexual penetration by a foreign object of a person under

21   the age of 18 (count 17) (Cal. Penal Code § 289(h)).  The jury also found that petitioner had

22   engaged in substantial sexual conduct as to counts 3, 4, 7, 8, 9 and 11 (Cal. Penal Code §

23   1203.066(a)(8)).  The jury also found that petitioner committed the offenses against two or more

24   victims (Cal. Penal Code § 667.61(e)(5)).

25              Petitioner was sentenced to 122 years to life.

26   /////

1

1       This action is proceeding on the original petition filed June 30, 2004.  On May 18,

2   2005, petitioner's counsel filed supplemental points and authorities.  The petition raises three

3   claims: 1) admission of prior statement by Sabrina R. violated the Confrontation Clause; 2)

4   admission of videotaped statements by the other victims violated the Confrontation Clause; and

5   3) insufficient evidence.

6       After carefully considering the record, the court recommends that the petition be

7   denied.

8   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

9       The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

10  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

11  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).  The AEDPA "worked

12  substantial changes to the law of habeas corpus," establishing more deferential standards of

13  review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

14  defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

15  1997).

16      In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

17  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

18  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

19  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

20  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

21  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

22  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

23  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

24      "Unreasonable application" of established law, on the other hand, applies to

25  mixed questions of law and fact, that is, the application of law to fact where there are no factually

26  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

1   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

3   deference is not blindly automatic, "the most important point is that an *unreasonable* application

4   of federal law is different from an incorrect application of law....[A] federal habeas court may not

5   issue the writ simply because that court concludes in its independent judgment that the relevant

6   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

7   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

8   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

9   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

10  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

11         The state courts need not have cited to federal authority, or even have indicated

12  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

13  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

14  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

15  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

16  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

17  established Supreme Court authority reviewed must be a pronouncement on constitutional

18  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

19  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

20         However, where the state courts have not addressed the constitutional issue in

21  dispute in any reasoned opinion, the federal court will independently review the record in

22  adjudication of that issue.  "Independent review of the record is not de novo review of the

23  constitutional issue, but rather, the only method by which we can determine whether a silent state

24  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

25  2003).

26  /////

1    In reviewing a state court's summary denial of a habeas petition, this court must

2  "look through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard,

3  234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).  In the instant case, the California Court of Appeal

4  issued a decision explaining its reasons for denying two of petitioner's federal claims.

5  Petitioner's Exhibit A.  The California Supreme Court denied petitioner's petition for review

6  without comment or citation.  Petitioner's Exhibit C.

7  III.  Factual Background

8    The opinion by the California Court of Appeal contains a factual summary.  After

9  independently reviewing the record, the court finds this summary to be accurate and adopts it

10  below.

11    Except as to count 17, the victims were children placed with foster families by
     Families United, Inc., a Sacramento County agency.  Defendant's girlfriend,
12   Rebecca Middleton, provided day care and babysitting services for the victims'
     foster parents.  During most of the period in which the crimes occurred, defendant
13   and Middleton lived together in one or another apartment.

14   **Count 1 (A.C.)**

15   A.C. was eight years old at the time of trial.  Her foster parents had brought her to
     Middleton's home for babysitting.  Both Middleton and defendant babysat her.
16   A.C. testified that defendant touched her vagina more than once while she was at
     Middleton's home; she estimated that he did so between six and 10 times
17   altogether.  He touched her under her panties, both inside and outside her vagina.
     He would tell her to come into his room; whenever she did, he would touch her.
18   When she told him to stop, sometimes he would and sometimes he would not.
     A.C. told Middleton about it, but could not remember how Middleton had
19   responded.

20   A.C.'s videotaped MDIC interview was played for the jury, which also
     received a transcript.  A.C. admitted that she told the interviewer defendant
21   touched her only once, but explained she had said that because she was shy; it
     actually happened more often.
22
     **Count 2 (C.C.)**
23
     C.C., A.C.'s younger sister, was seven years old at the time of trial. She and her
24   sister had lived with the same foster parents and had then been adopted by the
     same family.
25
     C.C. testified that on three occasions while she was at Middleton's and
26   defendant's home, sleeping in a sleeping bag, defendant touched her vagina on the

inside under her panties. She was confused about Middleton's identity, at first calling her defendant's mother. She had watched her MDIC interview before testifying, and had spoken to her sister and her adoptive mother about her molestation.

C.C.'s MDIC interview was played for the jury, and a transcript was provided. There, C.C., who was five years old at the time, said "Josh" (defendant) more than once did something to her that "wasn't okay." She could not remember all the details, but she recalled that defendant came into the room where she and other girls were trying to sleep on the floor, then did something between her legs, putting his hand under her panties. Defendant's "mom" was in bed watching television. C.C. was four years old when it happened. She told her mother about it afterward.

**Counts 3-6 (C.G.)**

C.G. testified that while living with foster parents Lori and Chuck L., she would be taken to Middleton's home for babysitting. Middleton lived at three different locations during this period. Defendant touched her inappropriately at each. At the first location, defendant touched C.G.'s vagina once in the bedroom; she awoke as he was rubbing it. At the second location, he touched her vagina twice, rubbing her as she slept on the floor next to L.C. (the victim in counts 7-11); she woke to see his hands under her clothes, but he ran off as Middleton came downstairs. C.G. asked him to stop once, but he did not. At the third location, he touched her vagina and her chest.

C.G. repeatedly complained to Middleton about defendant's touchings. At the first location, Middleton said the person who did it must have been "Tim," who also lived there. Defendant also blamed Tim.

At the second location, Middleton blamed the touching on a boy Middleton babysat. When C.G. said she was going to tell Lori L., her foster mother, Middleton told her not to because defendant would go to jail; C.G. did not tell Lori L.

At the third location, after defendant touched C.G. she screamed for Middleton, who was in the same room; Middleton told her to move over next to her, and defendant stopped touching her. The next day C.G. and Middleton spoke to defendant about it, and he said he would turn himself in to the police; however, he did not do so.

In her MDIC interview, done when she was 10 years old, C.G. gave an account generally consistent with her trial testimony. [Footnote]

> [Footnote: Defendant asserts C.G. was inconsistent as to where the first touching occurred, sometimes saying it was in the living room and sometimes in the bedroom. We see no inconsistency at the cited passages. The questions and answers in that sequence did not purport to describe a strict chronological order or to identify which was the first touching.]

/////

She estimated the touchings occurred about six times at all three locations together.

**Counts 7-11 (L.C.)**

Lori L. Was also L.C.'s foster mother for two years, beginning when L.C. was eight years old.  C.G. and L.C. were in Lori L.'s home at overlapping times and regularly interacted.  L.C. functioned intellectually below her chronological age.  Lori L. testified that she had taken L.C. to Middleton's home for babysitting about 20 times, but quit doing so after L.C. said defendant had been touching her inside her panties.  L.C. did not volunteer this information, but gave it after Lori L. said she had heard of other molestations by defendant.

L.C., who was 12 years old at the time of trial, testified that defendant had touched her on her chest and private part "a lot" when she was at Middleton's home.  (L.C. remembered Middleton had lived in three different places during this period.)  The first time defendant touched her, she was sleeping.  Another time she woke up and found her shorts had been removed.  She did not see defendant touching her because she was asleep when it happened, but she was sure it could not have been Middleton who touched her. She once told Middleton defendant had touched her by coming up underneath her in a swimming pool; Middleton said it was an accident and asked her not to tell her foster mother.

In L.C.'s MDIC interview, she said defendant touched her first when she was nine years old, sleeping in the living room with other girls, including C.G.  (C.G. told her the next morning that defendant had touched C.G. in a private spot.)  Defendant touched L.C. inside her panties and inside her private spot.  L.C. told Middleton about it after every incident; Middleton always said it was an accident.  Defendant denied touching anymore, but he was lying.  Even though she was asleep when defendant touched her, she could feel it.  The touchings happened at all three residences where Middleton and defendant lived.

**Counts 12-13 (A.W.)**

A.W., who was six years old at the time of trial, denied that anything improper had happened.  She also denied knowing or recognizing anyone in court.  In her MDIC interview, conducted when she was four years old, A.W. said at first that defendant had done nothing wrong.  However, she also said that she did not like "Josh," that he did something to her "pee pee," that his butt touched her "inside it," that she had been touched with a  "tic tac" on her butt, and that it hurt and there was blood.  She was two years old when she was at Middleton's home. [Footnote 4]

> [Footnote 4: After saying she did not want to talk about what happened at Middleton's home, she said, "leave me alone" and crawled under some furniture.  She then clarified that she did not want to talk about "Josh," whom she called Middleton's son.]

/////

/////

**Counts 14-15 (S.R.)**

S.R. was seven years old at the time of trial.  She testified that she did not recognize defendant and could not recall any incidents of abuse.

Sacramento County Sheriff's Detective Steven Osborne testified that he interviewed S.R. at her home when she was four years old, in the presence of her adoptive mother, Debra D. S.R. remembered having been babysat at Middleton's home, and she identified Middleton and defendant when shown photographs of them.  However, when Osborne began questioning her about abuse, S.R. would not answer.  Debra D. took S.R. onto her lap and took over the questioning. Debra D. asked S.R. if anyone had ever touched her where they should not. After reminding S.R. that she had put her mouth on her brother's penis, Debra D. asked her if she had ever done so to anyone else.  S.R. answered, "Yes, Josh."  S.R. then said "Josh" had put his finger in her butt, and that they played a game she called "icky kitty."

Debra D. testified that when S.R. came into her home as a three-year-old foster child she would seductively dance naked around the boys in the house, rub up against people like a kitty cat, and masturbate in public. After Debra D. mentioned some of this behavior during the interview, S.R. admitted putting her mouth on defendant's penis and playing a game with him called "thumb-in-the-butt game." Detective Osborne testified that he did not arrange an MDIC interview for S.R. because she was too young and shy, and because parents are not allowed to be present during those interviews.  He thought S.R. would not answer any questions unless Debra D. was there.

**Count 17 (N.G.)**

N.G., 20 years old at the time of trial, was formerly a close friend of Middleton. During Christmas vacation when she was 16, she visited Middleton's home.  As she lay asleep on the couch, drowsy from flu medication, defendant began touching her vagina, inside and out.  She could not physically resist, but when she said, "no" for the second time he stopped.  On cross-examination, she could not remember if she and defendant had ever had consensual sex.

**The pretext phone call**

Detective Osborne asked Andrea Williams, the Sacramento area director of Families United, Inc., to make a pretext phone call to defendant to see if he would admit the charges against him.  At Osborne's direction, Williams told defendant she was concerned about the agency's reputation and her own job security.  The call was taped.  The tape was played for the jury and transcripts were provided. At first defendant denied all wrongdoing.  Then he admitted touching one victim's vagina.  Later he admitted touching more of the victim's vaginas, as many as six or seven.  He promised not to do it anymore.

**The box**

Detective Osborne obtained a box from defendant's residence.  It contained about 100 cut-out photographs of little girls.

7

**The police interview**

After arresting defendant, Detective Osborne and two other officers transported him to the Sheriff's Department. Osborne read him his rights, obtained his consent to talk, and interviewed him on videotape. The videotape was played in part for the jury, and transcripts were provided. Osborne testified that the videotape accurately recorded the conversation. He also testified that before the interview began no one threatened defendant or told him what he had to say. In the interview, when first asked if he had abused an alleged victim (L.C.), defendant denied it; he blamed a roommate for whatever might have happened and insisted he himself "wouldn't do anything like that." Eventually, however, he said "it only happened once," then admitted touching and rubbing L.C.'s vagina over her panties. Soon afterward, he admitted touching her once over her clothes and once under her clothes. Then he admitted touching her at each of his three residences. After that, he admitted touching C.G.'s vagina three times on the outside and at least twice on the inside. He knew that C.G. and L.C. had told Middleton, and she had threatened to break up with him.

Defendant admitted touching A.C. and C.C. on the vagina under their panties about five times each. (He made similar admissions as to several girls who were not named as victims in the information.) He admitted touching A.W. once inside her "pull-ups diaper" when she was two years old. He also admitted getting C.C. to touch his penis once. He claimed not to remember S.R., however. Defendant admitted he put his mouth on the vaginas of all the victims (except for C.G.) And put his finger in the "butts" of the older ones (again, except for C.G.). That usually happened at night when they were sleeping over, whereas the other things happened during the day.

**Defendant's testimony**

Testifying on his own behalf, defendant claimed total innocence. He never touched any of the minors inappropriately. He had never even seen A.W. or S.R. before. As for N.G., the alleged victim in count 17, they may have once had consensual sex; he was sure N.G. participated willingly in whatever happened, and he never used force on her.

Defendant could not remember much about the pretext phone call. He told the caller "those things" to get her off the phone.

Defendant was arrested at his home by three large officers, who came to the door and handcuffed him. (Defendant is five-feet-three inches tall and weighs 115-120 pounds.) The officers threatened him the car on the way to the station, saying he had "better tell them what they want[ed] to hear." He feared they would beat him. He was still frightened during his interrogation. He admitted, however, that Detective Osborne did not threaten him during the interrogation and the other officers were not in the room.

He made up everything he supposedly confessed to Detective Osborne. However, he actually saw his roommate Tim Kelly molesting L.C., as he told Osborne.

\\\\\

8

**Rebuttal**

Jason Gay, one of the officers who arrested defendant and rode back to the station with him, denied threatening him.  Detective Osborne spoke to defendant during the trip about the booking process.

Petitioner's Exhibit A, pp. 3-12.

IV.  <u>Discussion</u>

    A.  <u>Claim 1: Admission of S.R.'s Prior Statement Violated Confrontation Clause</u>

    Petitioner contends that admission of S.R.'s prior statement violated the Confrontation Clause.  Respondent first argues that this claim is procedurally defaulted.

    Although the question of procedural default and other general prerequisites for federal habeas corpus which are unrelated to the merits of the particular claims "should ordinarily be considered first," a reviewing court need not do so "invariably," especially when those issues turn on difficult questions of state law.  <u>Lambrix v. Singletary</u>, 520 U.S. 518, 524-25, 117 S. Ct. 1517 (1977) (court bypassed question of procedural default to reach the merits of petitioner's claims).  <u>See</u> <u>also</u> <u>Busby v. Dretke</u>, 359 F.3d 708, 720 (5th Cir. 2004) (same).  In the instant case, the California Court of Appeal found that petitioner's counsel waived his claim challenging admission of S.R.'s prior statement pursuant to Cal. Evid. Code § 1360.  Whether this finding included petitioner's challenge to admission of S.R.'s prior statement on grounds that it violated the Confrontation Clause is not entirely clear.  In this case, the court finds that petitioner's claim can be resolved more easily by addressing its merits.  Accordingly, the court will assume for the sake of these findings and recommendations that the instant claim is not procedurally barred.

    The Confrontation Clause permits use of out-of-court statements so long as the witness is physically present at trial.  "Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."  <u>Crawford v. Washington</u>, 541 U.S. 36, __(n.9), 124 S. Ct. 1354, 1369 (2004).  While petitioner's counsel may have a logical point in that it would seem that a witness who cannot recall anything about the statement to be admitted, or even the event at issue

itself, is not *really* subject to cross-examination, that point was decided adversely to petitioner in United States v. Owens, 484 U.S. 554, 559, 108 S. Ct. 838 (1988) (witness who suffered brain trauma causing complete memory loss regarding his previous identification was "subject to cross-examination" on the out-of-court identification statement).  Although the witness may be "unavailable" for purposes of the hearsay rule exceptions because of complete lack of memory, Owens determined that "subject to cross-examination" and "unavailability" were distinct concepts.

In the instant case, S.R. testified at trial.  RT at 554-556.  Although petitioner's counsel chose not to cross-examine her (because she understandably had no recollection of the interview or event at all), he had the "opportunity" to do so.  RT at 556.  Because S.R. testified at trial and petitioner had an opportunity to cross-examine her, no Confrontation Clause violation occurred by the admission of her prior statements.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

B.  Claim 2: Admission of Videotaped Interviews

Petitioner argues that admission of the videotaped interviews of the other victims violated the Confrontation Clause.  The California Court of Appeal addressed this claim on the merits.  Respondent argues that this claim is procedurally defaulted as well.  For the reasons discussed regarding petitioner's claim one, the court finds that this claim can also be more easily resolved on the merits.  Accordingly, the court will assume for the sake of these findings and recommendations that this claim is not procedurally barred.

For the same reason petitioner's claim challenging admission of S.R.'s prior statement fails, the instant claim fails as well.  All of the victims appeared in court.  Under these circumstances, admission of their videotaped interviews did not violate the Confrontation Clause. Crawford, Owens, supra.

1    The denial of this claim by the California Court of Appeal was not an

2 unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

3 should be denied.

4    C.  Claim 3: Insufficient Evidence

5    Petitioner alleges that there was insufficient evidence to support his convictions

6 relating to S.R. and A.W.

7    When a challenge is brought alleging insufficient evidence, federal habeas corpus

8 relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

9 most favorable to the prosecution, no rational trier of fact could have found "the essential

10 elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

11 319, 99 S. Ct. 2781, 2789 (1979).  Under Jackson, the court reviews the entire record when the

12 sufficiency of the evidence is challenged on habeas.  Adamson v. Ricketts, 758 F.2d 441, 448 n.

13 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483

14 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

15 evidence, and to draw reasonable inferences from basic facts."  Jackson, 443 U.S. at 319, 99 S.

16 Ct. at 2789.  "The question is not whether we are personally convinced beyond a reasonable

17 doubt.  It is whether rational jurors could have reached the same conclusion that these jurors

18 reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

19    If the trier of fact could draw conflicting inferences from the evidence, the court in

20 its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

21 469 (9th Cir. 1994).  The fact that petitioner can construct from the evidence alternative scenarios

22 at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

23 trier of fact could have found the conviction scenario beyond a reasonable doubt.

24    In reviewing the sufficiency of the evidence supporting a
       conviction, we search the record to determine "whether a
25    reasonable jury, after viewing the evidence in the light most
       favorable to the government, could have found the defendants
26    guilty beyond a reasonable doubt of each essential element of the

crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

The California Court of Appeal denied this claim for the following reasons[1]:

Here, as defendant points out, A.W. and S.R. testified that no molestation occurred.  As discussed in part I, however, S.R. gave a prior statement to Detective Osborne accusing defendant of molesting her, and A.W., like the other minor victims, gave such a prior statement in an MDIC interview.  Furthermore, defendant admitted to Detective Osborne that he touched A.W. under her diaper once, though denying any touching of S.R.

According to Detective Osborne and Debra D., S.R. said defendant put her mouth on defendant's penis and played a "thumb-in-the-butt" game with him.  After indicating the vagina on a picture, A.W. told the MDIC interviewer that defendant had done something to that part; that defendant hurt her in her butt; that he touched her vagina with something; and that both vaginal and rectal touchings involved "blood," "hurt," and "pain."

Relying on his previous arguments, defendant asserts that neither S.R.'s statement nor A.W.'s interview was properly in evidence.  For the reasons stated in parts I and II above, we reject that contention.  We also reiterate that the jury could appropriately consider both victims' prior inconsistent statements for their truth, as it was instructed.  (Evid. Code, § 1235; People v. Montiel, supra, 5 Cal.4th 877, 930; People v. Hawthorne, supra, 4 Cal.4th 43, 55, fn. 4.)

---

[1] Page 26 of the opinion by the California Court of Appeal, containing the analysis of the instant claim, filed by petitioner is missing.  Accordingly, the court has cited the relevant pages of the opinion contained on Westlaw.

1   Defendant asserts further, however, that even if properly in evidence the prior
2   statements were insufficient to prove his guilt because they were inherently
    improbable.  We are not persuaded.

3   Evidence is inherently improbable only if it is physically impossible or its falsity
    is apparent without resorting to inferences or deductions.  (People v. Mayberry
4   (1975) 15 Cal.3d 143, 150.)  Defendant does not claim A.W.'s or S.R.'s
    accusations were physically impossible.  Instead, he asserts they cannot be
5   believed because the minors, interviewed at age four, purported to recall events
    that occurred when they were two. This assertion does not establish inherent
6   improbability.

7   According to defendant, "a two-year old child simply does not have the cognitive
    ability to recall and describe events at that age.  It defies common sense to expect
8   that a four-year old child could recreate and articulate events that occurred as a
    two-year old, without any showing of unusual abilities for that particular child."
9   This argument fails for two reasons.  First, defendant cites no authority for it; he
    cites inferences and deductions.  Evidence which can be attacked only in this way
10  is by definition not inherently improbable.  (People v. Mayberry, supra, 15 Cal.3d
    143, 150.)  Defendant has failed to show the victims' prior statements (along with
11  his own admission as to A.W.) were insufficient to convict him on counts 12
    through 15.

12

13  People v. Phillips, 2003 WL 21949869 * 10-11 (2001).

14          Petitioner's insufficiency of the evidence claim is simply the flip side of a claim

15  that a four year old witness is not competent to testify (in an out-of-court statement regarding

16  events that transpired when the four year old was two).  Competency of a witness under state law

17  is determined by state law—an area where the federal habeas courts are not permitted to review.

18  However, and despite the dismissiveness of the Court of Appeal, there are limits determined by

19  common experience concerning when a child is so young, and recollection of events occurring at

20  two years old and below are so improbable, that due process comes into play.  Or, in the words of

21  the present claim, the evidence will be insufficient as a matter of federal constitutional law for

22  any purpose.

23          The problem in the AEDPA context is that petitioner must show that the

24  California Court of Appeal unreasonably applied the Jackson standard.  While common

25  experience comes close to demonstrating that it did, close is not good enough.  The scenario of a

26  four year old remembering what happened at two years old is not so improbable, not so out of the

1  question in common experience, that this court could make an "unreasonable" finding.  And, as

2  noted by the Court of appeal, there is no evidence in the record demonstrating the child's

3  incompetence.

4          For the reasons stated by the California Court of Appeal, this court finds that there

5  was sufficient evidence to support petitioner's convictions with respect to S.R. and A.W.

6  Because the denial of this claim by the California Court of Appeal was not an unreasonable

7  application of clearly established Supreme Court authority, this claim should be denied.

8          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

9  a writ of habeas corpus be denied.

10         These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED:  3/7/06

19                                                     /s/ Gregory G. Hollows

20                                                     _____
                                                       GREGORY G. HOLLOWS
                                                       UNITED STATES MAGISTRATE JUDGE
21

22  ggh:kj
    phil1257.hab
23

24

25

26

                                   14